## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06 C 0787 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JOHN DOSSEY, KEVIN LAUDE, | ) | |
| DENNIS ROGERS, JOHN RAYBURN, | ) | |
| DROPKA & RAYBURN FIRE | ) | |
| INVESTIGATION, INC., KEVIN | ) | |
| MCMAHON, and THE ALLSTATE | ) | |
| CORPORATION a/k/a ALLSTATE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Mary Johnson brings Section 1983 claims alleging due process and

*Brady v. Maryland*, 373 U.S. 83 (1963), violations, as well as various Illinois state law

claims alleging malicious prosecution, false arrest and false imprisonment, and civil

conspiracy. Defendants John Dossey, Kevin Laude, Dennis Rogers, John Rayburn,

Dropka & Rayburn Fire Investigation, Inc., Kevin McMahon, and the Allstate Insurance

Company ("Allstate") move for summary judgment with respect to all of these claims. In

addition, Johnson moves for partial summary judgment against Laude. For the reasons

stated below, the court grants the summary judgment motions of Laude, Dossey, Rogers,

Rayburn, Dropka & Rayburn Fire Investigation, Inc., McMahon, and Allstate. The court

denies Johnson's motion for partial summary judgment against Laude.[1]

---

[1] In addition, the court denies Dossey's motion to strike exhibits relied upon by the plaintiff (ECF No. 174) as moot. Even assuming that all of the challenged evidence is admissible and viewed in the light most favorable to Johnson, Dossey still prevails on summary judgment.

# I. BACKGROUND

This case centers on a fire that occurred in the rented home of the plaintiff, Mary Johnson, and the ensuing investigation of that fire by law enforcement officials and Allstate. Johnson was arrested, indicted by a grand jury, and convicted of aggravated arson and insurance fraud for her alleged role in starting the fire; her insurer, Allstate, denied her insurance claim. After Johnson had been convicted and had served over a year in prison, her counsel discovered an official "cause and origin" report prepared by federal Alcohol, Tobacco and Firearms ("ATF") Special Agent John Gamboa indicating the absence of an accelerant and thus suggesting that Johnson may not have started the fire. As a result, Johnson was granted a new trial. At her second trial, she was acquitted. After her acquittal, Johnson filed this suit against the defendants.

## A. The Johnson and Ruffai Fires

Johnson moved to a home located at 1174 San Simeon in Hanover Park, Illinois, in 1999. At some point in 2001, Johnson became delinquent on her rent and her landlord, Gurpreet Gill, began eviction proceedings. Johnson resolved this issue with Gill when she agreed to vacate her home in early 2002. Meanwhile, on December 15, 2001, Johnson purchased a $30,000 renter's insurance policy with Allstate. In January or February 2002, Johnson made an offer to buy a home in Aurora, Illinois. The closing on that property was scheduled for March 29, 2002.

On the morning of March 26, 2002, shortly after Johnson left for work, a fire occurred at Johnson's residence ("the Johnson fire"). Johnson had been home alone that morning; her son, daughter, and nephew who lived with her at the time were elsewhere. Shortly after Johnson arrived at work, Johnson was told to call her mother and drive

home.  While driving home, Johnson was informed that her house was on fire.  After Johnson returned home and spoke with police on the scene, she went to the Hanover Park police station to answer questions.  Johnson left the police station around 1:00 PM that afternoon and contacted her insurer, Allstate, to file an insurance claim.  Johnson subsequently filed a proof of loss statement with Allstate listing losses totaling over $50,000, which Allstate received on April 24, 2002.

At some point prior to the fire, Johnson was romantically involved with Tai Ruffai.  On December 31, 2000, Ruffai went to the Hanover Park police station to report that Johnson had made threats to burn down his property.  When Ruffai returned home early on the morning of January 1, 2001, he discovered that there had been a fire in his home ("the Ruffai fire").  Although Johnson was charged with causing the Ruffai fire and the Ruffai fire charge was included in Johnson's first trial (along with charges arising from the fire at her own home), she was acquitted of this charge.

### B.  The Law Enforcement Investigations and Reports

Detective John Dossey,  a state certified fire investigator, investigated the Johnson fire on behalf of the Hanover Park police department.  He had had prior contact with Johnson in connection with the Ruffai fire and was aware of the evidence linking her to that fire.  Dennis Rogers was the Detective Commander of the DuPage County Fire Investigation Task Force (the "Task Force"), which was also involved in investigating the Johnson fire.  On the day of the Johnson fire, ATF Special Agent Gamboa conducted a cause and origin investigation at the fire scene on behalf of the Task Force.  Kevin Laude, who prosecuted arson cases for the DuPage County State's Attorney's Office and

who would ultimately prosecute the arson case against Johnson, considered himself a member of the Task Force, representing the DuPage County State's Attorney's Office.

John Rayburn is a certified fire investigator employed by Dropka & Rayburn Fire Investigation, Inc. Rayburn was retained by Allstate in connection with the investigation of the Johnson fire. Kevin McMahon was the Allstate insurance claims investigator working on the Johnson fire case.

On April 1, 2002, Detective Commander Rogers informed Allstate's adjuster that the fire in Johnson's home was "suspicious." Rogers also informed the adjuster, who relayed this information to McMahon, that Johnson was a suspect in the Ruffai fire. Allstate assigned Johnson's claim to its Special Investigations Unit, designating McMahon to investigate Johnson's claim. Allstate retained Rayburn to perform a cause and origin investigation on its behalf. Rayburn collected debris samples from Johnson's home on or about April 10, 2002, which he submitted to Great Lakes Analytical for testing on April 11, 2002. Rayburn used the information he received from Great Lakes Analytical, along with information from Joseph Leane, a consulting engineer who inspected Johnson's home in April 2002, to produce his own cause and origin report.

The investigations of the Johnson fire generated a number of reports: a Task Force Report, dated March 27, 2002; a cause and origin report prepared by Agent Gamboa ("the Gamboa Report"), which is undated but deals with an examination conducted on the day of the fire; a report prepared by Great Lakes Analytical (the "Great Lakes Report"), dated April 17, 2002; and Rayburn's report, dated December 14, 2002.

The Task Force Report notes that the fire originated in the kitchen (*See* Ex. 65 at MJ2184). It states explicitly that "S/A Gamboa from ATF will file a C/O [cause and origin] report." [2]

The Great Lakes Report, which analyzed the debris collected by Rayburn for McMahon and Allstate, concluded that "[a]liphatic hydrocarbons in the range of a medium petroleum distillate (MPD) were detected" in a sample that Rayburn obtained from the southeast corner of Johnson's kitchen. (Ex. 68, Laude Dep., Ex. 4.)

Rayburn's December 14, 2002 report was completed after Allstate had denied Johnson's claim. The actual report has not been provided to the court. It has been established, however, that Rayburn was of the opinion that the sample he collected from the fire scene was positive for charcoal lighter fluid based on an undocumented verbal conversation between Rayburn and Dirk Hedglin, a forensic chemist who prepared the Great Lakes Report, as well as Rayburn's personal observation, also undocumented and not disclosed until 2011, that he smelled charcoal lighter fluid in the sample prior to sending it to Great Lakes. Rayburn's report apparently concluded that charcoal lighter fluid was found in a sample of debris taken from Johnson's home. This conclusion was erroneous.

The Gamboa Report is the crux of the legal claims in this case. Like the Task Force Report, the Gamboa Report stated that the cause of the fire was "undetermined" at the time of the report (Ex. 70 at MJ2187), and that the "undetermined fire will continue to be investigated" by the Task Force. (*Id.* at MJ2190.) Significantly, however, it also indicated that a canine fire scene examination had been conducted, and that the canine

---

[2] Unless otherwise indicated, references to exhibits are references to the exhibits attached to the Defendants' Joint 56.1 Statement of Material Facts, ECF No. 141.

"did not detect any flammable or combustible accelerants in the residence." (*Id.* at MJ2187.)[3]  It is undisputed that Johnson was not given this report prior to her first trial. It was discovered by her second attorney, after she had been convicted and served considerable time in jail.  Johnson was granted a new trial because her trial judge ruled that the Gamboa Report was exculpatory evidence and should have been turned over to her pursuant to *Brady.*  The primary issue which divides the parties here is whether the failure to turn over the report, or the failure to disclose the results of the canine examination before Johnson's first trial, is evidence of tortious conduct under Illinois law or constituted a constitutional violation under federal law.  The defendants claim that they did not have the report before Johnson's first trial, although there is evidence that some of them knew of the results of the canine examination at or around the time Agent Gamboa examined the scene and the report was found in the files of the DuPage County Arson Task Force approximately thirteen months after Johnson's first trial.

### C.  The April 5, 2002 Meeting at the Hanover Park Police Department

Johnson contends that a meeting held at the Hanover police department on April 5, 2002 to discuss the Johnson fire was at the center of the conspiracies she alleges. Dossey, Rogers and Laude were present at this meeting, as were McMahon and Rayburn, although the defendants assert that 30-45 minutes of the meeting involved law enforcement only and that McMahon and Rayburn were invited in for only five to ten minutes.  (Defs' Joint 56.1(a)(3) Stmt. ¶¶ 174, 175.)  Johnson disputes this assertion, but the material she cites in support fails to contradict it.  In any event, it is undisputed that it

---

[3]     It is undisputed that a canine's failure to detect an accelerant does not necessarily rule out its presence because "accelerants could be hidden below debris."  (Defs.' Joint 56.1(a)(3) Stmt. ¶ 219.) While this is undisputed and the court must accept it as a fact, the court is skeptical.  Dogs are typically used because they are able to sniff through debris.

was "normal procedure" for McMahon (and presumably Rayburn) to be invited to such a meeting because law enforcement tries to include all entities that are involved in an ongoing fire investigation where the cause is undetermined. During the meeting, Dossey served McMahon with a "Form II request," which, pursuant to Illinois law, *see* 215 Ill. Comp. Stat. § 145/1, requires that insurance companies investigating fire claims release their investigatory materials to law enforcement. It is common and routine for the Task Force to rely upon findings of engineers hired by insurance companies to investigate the electrical or mechanical causes of fires, since the Task Force lacks the resources to hire such engineers itself. Similarly, Allstate routinely requests police and fire department reports, including witness reports, as it did in this case.

A critical issue is whether Agent Gamboa's findings, and/or the negative canine examination, were discussed at the April 5, 2002 meeting. In trial testimony at Johnson's second trial, Agent Gamboa, who was not deposed in this case, testified that it is "part of our procedure" to make reports such as his available to the members of the Task Force. (Ex. 12 at 70.)[4] Johnson relies heavily on a statement of Kevin Laude, given in the course of his deposition in this case: when asked whether a discussion of the findings of the Task Force during the April 5 meeting included the fact that a canine examination did not detect the presence of an accelerant, he testified, "I think it must have." (Ex. 68, Laude Dep. at 52.) Rogers testified that he knew as of March 26, 2002 that the canine examination had been negative for the presence of an accelerant, but he further testified that he did not "know if [he] would [have] share[d]" that information during the meeting.

---

[4] The defendants argue that Agent Gamboa's trial testimony is inadmissible hearsay. This objection is overruled. Everything submitted in connection with a summary judgment motion is hearsay, and that hardly renders it "inadmissible" for summary judgment purposes. *See Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976).

(Ex. 23, Rogers Dep. at 93.)[5]  Dossey testified that he did not believe that he was made aware of any evidence that "had ruled out the presence of an accelerant" at the meeting. (Ex. 22, Dossey Dep. at 105.)  Rayburn did not recall any discussion of the canine examination at the meeting (Ex. 24, Rayburn Dep. at 35), and McMahon testified that neither the canine search nor Agent Gamboa's investigation were discussed during the portion of the meeting he attended.  (Ex. 26, McMahon Dep. at 120, 216.)

### D.  Receipt of the Gamboa Report

In addition to the parties' dispute over whether the defendants learned about Agent Gamboa's findings at or before the April 5, 2002 meeting, they dispute whether Rogers, Dossey, and Laude received the actual Gamboa Report prior to Johnson's first trial.  As stated above, Agent Gamboa testified at Johnson's second trial that providing his report to the Task Force is "part of our procedure."  (Ex. 12 at 70.)  Rogers also admitted that he would have expected Gamboa to give his report to the State's Attorney's office "as a matter of routine policy and procedure."  (Ex. 23, Rogers Dep. at 58.)  It is undisputed that the Gamboa Report was found in the files of the DuPage County Arson Task Force in February 2005.

### E.  Allstate's Denial of Johnson's Claim

Soon after the April 5, 2002 meeting, McMahon received the results of the Great Lakes Report.  Once he combined the Great Lakes results with the information collected in his investigation and the information received at the April 5, 2002 meeting, McMahon ordered that Johnson be examined under oath by Allstate's law firm on April 25, 2002.

---

[5]      Agent Gamboa testified at Johnson's second trial that he communicated his cause and origin findings to Rogers.  (Ex. 12 at 69.)

On June 12, 2002, after Johnson had been examined under oath, the examining law firm recommended that Allstate deny Johnson's insurance claim. Allstate and McMahon denied Johnson's claim on June 25, 2002.

### F. Grand Jury Proceedings

Johnson was arrested on August 13, 2002. Grand jury proceedings took place on September 5, 2002, and an indictment was returned against Johnson for multiple counts of aggravated arson and insurance fraud that same day. Laude was the prosecutor who examined witnesses during the grand jury proceedings, and Dossey testified. Dossey testified that he reviewed reports which "related that there was a [sic] accelerate [sic] substance found around the kitchen area" of Johnson's residence. (Ex. 68, Laude Dep., Ex. 3 at 7 (Dossey grand jury testimony).)

While it is now clear that all that was found in the search of Johnson's kitchen was a medium petroleum distillate, a category which encompasses many accelerants as well as innocent substances, Dossey testified at his deposition that when he learned that what was found was "consistent with a [sic] charcoal lighter fluid," "[t]hat's what I would have believed it was." (Ex. 22, Dossey Dep. at 156.) It is undisputed that Dossey did not know that medium petroleum distillate was consistent with other substances besides charcoal lighter fluid, and it is further undisputed that he understood that the lab tests showed the presence of an accelerant. (Defs.' Joint 56.1(a)(3) Stmt. ¶¶ 98, 99, 106 and Pl.'s 56.1(b)(3)(A) Stmt. in Resp.) Although Dossey was wrong–the identification of a "medium petroleum distillate" does not conclusively establish the presence of an accelerant–Johnson has not identified any evidence that indicates that Dossey knew he was wrong at or before the time of his grand jury testimony.

### G.  Johnson's Trials

Johnson was tried  in the Circuit Court of DuPage County in January 2004.  The parties stipulated that Hedglin would testify if called that a debris sample from Johnson's residence, provided by Rayburn, contained aliphatic hydrocarbons in the range of a medium petroleum distillate and that charcoal lighter fluid, as well as other substances, fall within the range of medium petroleum distillates.  The Gamboa Report was neither disclosed to Johnson nor admitted in evidence.  On January 23, 2004, Johnson was convicted of aggravated arson and insurance fraud in connection with the fire at her home.  She was sentenced to 9 ½  years in prison.  *See Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008).

Johnson remained in prison from January 23, 2004 until February 10, 2005, when her new attorney subpoenaed the DuPage County Arson Task Force and received the Gamboa Report among the documents turned over pursuant to that subpoena.  (Aff. of Michael W. Fleming, Ex. A to Pl.'s Suppl. 56.1 Stmt.)  Johnson then moved for a new trial based on Laude's failure to disclose the Gamboa Report.  On February 23, 2005, Johnson was granted a new trial.  At the motion hearing, the trial judge ruled that, although the nondisclosure of the Gamboa Report may have been unintentional, the Gamboa Report was "information that the defense should have had."  (Ex. 9 at 8.)

Johnson's second trial began on August 30, 2005.  Agent Gamboa testified at this trial that, during the Task Force's March 2002 investigation, he determined that there were no indications of accelerants based on the burn patterns in the house and the results of the canine examination.  Johnson was acquitted of all charges on September 2, 2005, and filed this lawsuit on February 10, 2006.

### H. Allstate's Payment of Rayburn's Fee for Rayburn's Testimony at Johnson's First Trial

Although McMahon did not request that Rayburn testify at Johnson's trial, Rayburn was called to give testimony concerning the investigation he conducted for Allstate. Rayburn submitted a bill for his testimony to McMahon, and McMahon made the decision to authorize payment. McMahon declined to authorize payment for Rayburn's time spent testifying at Johnson's second trial because he concluded that Allstate had not asked Rayburn to testify.

## II. ANALYSIS

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for summary judgment, the court should view all evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, the party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). The evidence presented must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), and it may consist of affidavits or declarations that are "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The defendants have filed the following motions for summary judgment which, if granted, would result in the dismissal of this action. Dossey has moved for summary judgment on Johnson's state false arrest and imprisonment claim (Count I), her state malicious prosecution claim (Count II), her state false imprisonment claim (Count III), her state civil conspiracy to falsely arrest, maliciously prosecute and imprison claim (Count IV) and her federal Section 1983 claim based on an alleged *Brady* violation (Count V). Laude has moved for summary judgment on Johnson's state false imprisonment claim (Count VI), her state malicious prosecution claim (Count VII), her state false imprisonment claim (Count VIII), her state conspiracy to falsely arrest, maliciously prosecute and imprison claim (Count IX) and her federal Section 1983 *Brady* claim (Count X). Rogers has moved for summary judgment on Johnson's conspiracy to falsely arrest, maliciously prosecute and imprison claim (Count XI) and her federal Section 1983 *Brady* claim (Count XII). Rayburn has moved for summary judgment on Johnson's state law conspiracy to falsely arrest, maliciously prosecute and imprison claim (Count XIII) and her federal Section 1983 *Brady* claim (Count XIV). Dropka & Rayburn is similarly charged with state law conspiracy to falsely arrest, maliciously prosecute and imprison (Count XV) and a federal Section 1983 *Brady* violation, and it has moved for summary judgment on both. McMahon is similarly charged with state law conspiracy (Count XVII) and Section 1983 (Count XVIII) violations, and has moved for summary judgment. The same is true of Allstate (Counts XIX and XX).

Johnson has moved for summary judgment against Laude on four of the claims she has brought against him: Count VI for false imprisonment for the period August 13, 2002 through September 13, 2002 (the period from her arrest until her grand jury

indictment); Count VII for malicious prosecution; Count VIII for false imprisonment for the period January 23, 2004 through February 10, 2005 (her period of imprisonment following her first trial); and Count X for a violation of *Brady*.

### A. Malicious Prosecution

Dossey and Laude have moved for summary judgment on Johnson's claims of malicious prosecution. To prevail on a malicious prosecution claim in Illinois, the plaintiff must prove: "(1) the commencement or continuance of judicial proceedings by the defendant against the plaintiff; (2) a lack of probable cause for those proceedings; (3) malice in instituting the proceedings; (4) termination of the proceedings in the plaintiff's favor; and (5) damages resulting to the plaintiff." *Mosley v. City of Chi.*, 614 F.3d 391, 399 (7th Cir. 2010). There is no dispute that the defendants commenced judicial proceedings against Johnson; that such proceedings were ultimately terminated in Johnson's favor because she was acquitted at her second trial; and that Johnson suffered harm as a result of her incarceration between the time she was convicted and the time she was granted a new trial. But because the court concludes that the existence of probable cause was clear based on the undisputed facts of record, the court need not examine the issue of malice.

Probable cause requires "'a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged.'" *Id.* (quoting *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006)). The inquiry "is purely an objective one," and an "officer's subjective intent and beliefs are irrelevant." *Davis v. Owens*, 973 F.2d 574, 576 (7th Cir. 1992). Probable cause is established based on evidence available to the

police at the time of the arrest. *See Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010); *People v. Tisler*, 951 N.E.2d 1153, 1156 (Ill. App. Ct. 2011). Although "[p]robable cause requires more than a bare suspicion of criminal activity, . . . it does not require evidence sufficient to support a conviction." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). "'[A]n arresting officer is not required . . . to act as a judge or jury to determine whether a person's conduct satisfied all of the essential elements of a particular statute.'" *Sroga v. Weiglen*, 649 F.3d 604, 610 (7th Cir. 2011) (quoting *Stokes*, 599 F.3d at 622-23). In this case, a reasonable person would entertain an honest and strong suspicion that Johnson started the fire at her residence based on the evidence available to Dossey and Laude at the time of Johnson's arrest and prosecution.

Law enforcement officers were aware of a history of domestic problems between Johnson and Ruffai, of Johnson's reported threat on December 31, 2000 to burn Ruffai's house down and the fact that shortly thereafter, in the early morning hours of January 1, 2001, there was a fire at Ruffai's house. They knew that on June 3, 2001, an individual named Zina Bey had contacted the Hanover Park police department, stating that Johnson claimed to have burned down Ruffai's house and threatened to burn down Bey's. They knew that after Johnson's landlord had begun eviction proceedings against her in the fall of 2001, and roughly three months before the fire in December, 2001, Johnson obtained a $30,000 renter's insurance policy from Allstate. Neighbors told the police that on the night before the fire, they heard Johnson moving large items out of her house. The fire broke out shortly after Johnson had left for work, at a time when the other occupants of Johnson's residence–her son, daughter and nephew–were not at home. On the day of the

fire, a Forest Preserve Officer, Officer Spiegel, located a bag of personal items belonging to Johnson (papers, cosmetics, a hairpiece) in the Pratt Wayne Forest Preserve. The Great Lakes Report, completed a few days after the fire and known to law enforcement before the criminal proceedings against Johnson commenced, analyzed debris taken from Johnson's kitchen, where the fire had originated. The report stated that "aliphatic hydrocarbons in the range of a medium petroleum distillate (MPD) were detected;" various accelerants fall within the category of medium petroleum distillates, as do many innocent substances. However, it is undisputed that Dossey understood (albeit mistakenly) that this report meant that an accelerant had been found (Defs.' Joint 56.1(a)(3) Stmt. ¶ 106). Information obtained by law enforcement from Allstate prior to Johnson's arrest indicated that the engineers hired by Rayburn had ruled out various accidental causes of the fire.

In addition, Johnson had told Dossey that when firemen responded to the fire and opened the door of her house, her dog (which she had presumably left inside) had "burst out of the house." But a firefighter at the scene stated that when he opened the door to Johnson's unit, nothing–including a dog–ran past him, and a community service officer dispatched to the scene saw a dog running loose, wet but not burned. Moreover, when Johnson took the dog to the Lake Street Animal Hospital for boarding on March 27, 2002, the dog was neither injured nor burned. This information led Dossey to believe that Johnson was not being candid with him.

The evidence recounted above strongly suggests Johnson's guilt. Even assuming that Dossey and Laude had the Gamboa Report or knew of the negative results of the canine examination, the compelling evidence of probable cause would not be overcome,

as the "police may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence." *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006).[6]

Because Johnson cannot show the absence of probable cause to bring criminal proceedings against her, the court grants Dossey's and Laude's summary judgment motions on Johnson's malicious prosecution claims.[7]

## B. False Arrest and Imprisonment

Johnson's state law false arrest and false imprisonment claims, like her malicious prosecution claims, are asserted solely against Dossey and Laude. Probable cause is similarly an element of Illinois false arrest and false imprisonment claims. *See, e.g., Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222, 1231 (Ill. 1990) ("The essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff."); *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. Ct. 2006) (to establish claims of false arrest or false imprisonment, "a plaintiff has to show that she was unreasonably restrained without probable cause") Because the undisputed facts establish that probable

---

[6] The Gamboa Report by no means established Johnson's innocence: it stated that the cause of the fire was "undetermined" as of the canine sniff investigation. It also stated that the initial canine fire scene examination "did not detect any flammable or combustible accelerants in the residence," and that the "undetermined fire" would continue to be investigated. The parties agree, however, that a canine sniff with a negative result cannot rule out the presence of accelerants. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 219.)

[7] Johnson's pleadings at times suggest that Dossey and Laude knowingly used false evidence of the use of an accelerant, and she alleges that this conduct demonstrates their malice. But it is undisputed that Dossey believed that evidence found at the scene was consistent with the existence of an accelerant, and it is further undisputed that Laude believed that he had probable cause to prosecute Johnson. *See* Defs.'Joint 56.1(a)(3) Stmt. ¶¶ 98,99 & 240 (and the same paragraphs of Pl.'s 56.1(b)(3)(A) Stmt. in Resp.). These allegations of the knowing use of false evidence may relate to Johnson's allegations of malice, an element distinct from probable cause, or they may not be consistent with the facts as the facts came out during discovery.

cause for the initiation and prosecution of criminal charges against Johnson existed, summary judgment must be granted on these claims as well. [8]

### C. State Law Civil Conspiracy Claims

Johnson asserts state law civil conspiracy claims against Dossey and Laude, as well as against each of the other the defendants. She alleges that all of the defendants engaged in a conspiracy to falsely accuse, arrest, prosecute, and imprison her under Illinois state tort law. *See* First Am. Compl. Count IV, ¶ 89 against Dossey ("conspiracy to falsely arrest and imprison under the tort laws of the state of Illinois"); Count IX, ¶ 89 against Laude (same); Count XI, ¶ 89 against Rogers (same); Count XIII, ¶ 89 against Rayburn ("conspiracy to falsely arrest and imprison"); Count XV, ¶ 89 against Dropka & Rayburn (same as Rayburn); Count XVII, ¶ 88 against McMahon (same as Rayburn); Count XIX, ¶ 91 against Allstate (same as Rayburn).

"To succeed in a claim of civil conspiracy under Illinois law, . . . plaintiffs must . . . establish: (1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)). To prevail on an Illinois civil conspiracy claim, evidence of agreement alone is not enough, as the second element ensures that "[a] cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in

---

[8]     The court tends to agree with the defendants that to the extent Johnson is complaining about her arrest on August 13, 2002, her claim is time-barred. Johnson argues that the statute of limitations was tolled because of the defendants' active concealment. The court is not persuaded that anything was actively concealed that would make her false arrest claim timely. In any event, the court need not reach this issue.

furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). This is because the gist of the state law "conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Id.* Johnson, therefore, must be able to show that a genuine issue of material fact exists as to one or more of the underlying state law torts in her conspiracy claim. If none of those torts was committed, her state law civil conspiracy claims must fail.

As stated above, all of the state torts alleged by Johnson require proof of lack of probable cause. Since probable cause for Johnson's arrest and prosecution plainly existed, whether the Gamboa Report is considered in the mix or not, Johnson cannot complain of the violation of Illinois tort law. Accordingly, summary judgment must be granted on Johnson's Illinois civil conspiracy claims against Dossey and Johnson, as well as against the other five defendants.

### D. Section 1983 *Brady* Claims[9]

Johnson also asserts Section 1983 claims against each of the defendants, arguing that each of the defendants is liable for his or its role in suppressing exculpatory evidence in violation of *Brady v. Maryland*.

---

[9] It should be pointed out that in paragraph 204 of Defendants' Joint Rule 56.1(a)(3) Statement, the defendants assert, "None of the defendants in this case entered into any conspiracy or agreement at any time to deprive Johnson of any of her Brady rights by withholding ATF Agent Gamboa's undated Cause and Origin Report or any other evidence." Johnson responds that this paragraph is "Undisputed." Pl.'s Resp. to Defs.' 56.1(b)(3)(A) Stmt. ¶ 204. While the court has taken Johnson's other admissions seriously in trying to determine what is undisputed in this case, it has taken this admission as a likely accident, given the arguments in Johnson's briefs. The court notes, however, that deciding summary judgment motions in a case of this complexity is an enormously difficult and burdensome undertaking. Casual advocacy in the treatment of disputed and undisputed factual statements seriously impairs the court's ability to resolve these motions properly.

1. <u>Laude: After Formal Criminal Proceedings Were Initiated Against Johnson</u>

The court has no difficulty finding, as did Judge Bakalis, Johnson's state court judge, that Johnson has made out a *Brady* violation, whether unintentional or intentional. To demonstrate that a prosecutor violated *Brady* by suppressing evidence, Johnson must show that: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008). And "[e]vidence is 'material' if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). Evidence of a careful search that revealed no accelerant is clearly exculpatory in an arson prosecution, as Judge Bakalis observed, and if there were any doubt of its materiality, the fact that Johnson was acquitted when this evidence was presented to the jury is additional persuasive evidence that it was material. Nevertheless, the law is absolutely clear that once this case passed the investigative stage and Laude was preparing for and conducting Johnson's trial (or grand jury proceedings), his failure to turn over exculpatory evidence cannot subject him to damages, as his immunity is absolute. *Fields v. Wharrie*, ___ F.3d ___, 2012 WL 614714, at *6 (7th Cir. Feb. 28, 2012). Any claim against Laude for suppression of evidence in violation of *Brady* once formal proceedings against Johnson commenced is barred, and summary judgment is granted to Laude as to any such claims.

2. Laude:  Prior to the Time When Formal Criminal Proceedings Commenced

Even though Laude has absolute immunity for any conduct of a prosecutorial nature, his immunity is merely qualified insofar as he was acting in an investigatory role. Viewing the evidence in the light most favorable to Johnson, Johnson may be able to show that Laude was familiar with the Gamboa Report at least as early as the April 5, 2002 meeting at the Hanover Park police department.  Gamboa has testified that his report should have, as a matter of normal procedures, been distributed to the Arson Task Force, of which Laude was a member.  When Laude was asked during his deposition in this case whether the Gamboa Report had been discussed during the April 5, 2002 meeting, he answered, "I think it must have."  It is undisputed that Laude knew as of April 5, 2002 that Gamboa had performed a cause and origin investigation (Defs.' Joint 56.1(a)(3) Stmt. ¶ 228) and that there had been a canine sniff (Defs.' 56.1(a)(3) Stmt. ¶ 229).  Although Laude does not say  that he knew what Gamboa had found or what the canine sniff had discovered, a jury might find it hard to believe that an assistant state's attorney attached to the Arson Task Force and responsible for the Johnson case would know that such an investigation had occurred and remain ignorant of its results.  And a jury might be skeptical of the claim that the Gamboa Report, which was found in the Arson Task Force's files after Johnson was convicted, was not there before she was convicted.  Johnson takes the argument even further–probably a little further than the facts justify.[10]  She states, in her Memorandum in Response to Defendants' Joint and Several Motions for Summary Judgment, that during the April 5, 2002 meeting at the

---

[10]      Johnson cites for this proposition Defendants' Ex. 68, the Laude deposition, at p. 52, ll. 5-14. Laude testified that at the April 5, meeting, there was a discussion of the Arson Task Force's scene investigation on the day of the fire, and he further testified that the negative canine sniff "must have" been discussed.  Johnson's attorney has read the record a little more liberally than this court believes is justified. Nevertheless, it is clear that she contends that the record establishes Laude's knowledge of the Gamboa Report before Johnson was prosecuted.

Hanover Park police department, "the results of the Arson Task Force Investigation were discussed, as were the results of the K-9 search of the fire scene, indicating the absence of accelerants." The bottom line is that Johnson claims and indeed has a fair amount of circumstantial evidence that Laude must have known of the Gamboa Report before Johnson's trial.

During this investigative stage, however, Laude had no obligation to turn the Gamboa Report or its conclusions over to Johnson. The record makes clear that there was probable cause to arrest Johnson, the Gamboa Report notwithstanding, so it is difficult to identify a wrong that Laude committed at this investigative stage of the case. He could commit no *Brady* violation until formal proceedings commenced against Johnson, at which point he became absolutely immune.

Prior to the commencement of formal criminal proceedings, then, Laude, like Dossey and Rogers at all times, was subject to only qualified immunity. *See Johnson v. Dossey*, 515 F.3d 778, 783 (7th Cir. 2008) (citing *Buckley, supra*) ("Laude was part of the investigation of the fire and of a conspiracy that targeted Johnson" and "may claim, as can the other investigators, a qualified, but not an absolute, immunity."); *Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000). *Fields v. Wharrie, supra,* makes clear that suppression of exculpatory evidence by such persons is not a *Brady* violation. 2012 WL 714714, at *6. Rather, police (and presumably, a prosecutor acting in an investigatory capacity) have a *due process* obligation to preserve exculpatory evidence. *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 56-58 (1988)).[11] When police withhold material

---

[11]     The Seventh Circuit in *Fields v. Wharrie* states plainly that "the police . . . share the prosecutor's constitutional obligation to disclose exculpatory evidence to the defendant." 2012 WL 714714, *6. It cites *Arizona v. Youngblood* for the proposition that the police have a due process obligation "to preserve and disclose evidence they know to have exculpatory value." *Id. Youngblood* was an evidence *preservation* case, not an evidence *production* case, and it does not appear to hold that the police have evidence *production* responsibilities. Moreover, recent Seventh Circuit law is clear that the obligation of the police

exculpatory information from prosecutors, they are held responsible for *causing* a *Brady* violation, but they have violated due process, not *Brady. Id.* The private defendants (Rayburn, Dropka & Rayburn, McMahon and Allstate) could be held liable if it could be shown that they conspired with the law enforcement defendants to violate Johnson's due process rights by *causing* a *Brady* violation. *Johnson*, 515 F.3d at 782. The issue is whether a prosecutor like Laude, acting in an investigatory capacity and subject only to qualified immunity, can be part of a Section 1983 conspiracy to commit a due process violation by suppressing exculpatory information. It is not obvious to this court that such a conspiracy could not be formed, and that it could not include a prosecutor acting in an investigatory rather than a prosecutorial role.

Here, however, because the prosecutor who allegedly conspired to suppress evidence was ultimately the *trial* prosecutor, Johnson's theory (if this, after *Fields v. Wharrie*, is plaintiff's theory[12]) runs into an obstacle. Johnson has argued vociferously that Laude knew about the Gamboa Report at least by the time of the April 5, 2002 meeting at the Hanover Park police department, and if Laude knew about the exculpatory evidence, then the other defendants could not have conspired to cause him to violate *Brady.* If the other defendants did not conspire to *cause* Laude to violate *Brady*, it is difficult to understand what Johnson is claiming they conspired to do. The obligation which *Brady* imposes on police officers is to report exculpatory evidence to a "competent authority" such as the prosecutor. *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007). *See also Holland v. City of Chi.*, 643 F.3d 248, 255 (7th Cir. 2011) ("[P]olice officers can

---

who are investigating a case is to make the prosecutor aware of exculpatory evidence, not to produce it to the defendant themselves. *See Holland v. City of Chi.*, 643 F.3d 248, 255 (7th Cir. 2011).

[12]     The parties' briefs were filed before the Seventh Circuit's decision in *Fields v. Wharrie*, and they have not had an opportunity to shape their contentions in light of that case.

be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors and the withholding of evidence is "'material.'")

Even if it is assumed that Laude did not know about the Gamboa findings prior to the commencement of formal criminal proceedings against Johnson (and it is undisputed that Laude knew that Gamboa had performed a cause and origin investigation and that there had been a canine sniff), there is no evidence that Dossey or Rogers knowingly or deliberately withheld this information from Laude. *See Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (police are liable when they act knowingly or with reckless indifference); *Newsome v. McCabe*, 260 F.3d 824, 825 (7th Cir. 2001) ("But if the right characterization of the defendants' conduct is that they deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem.") Although Rogers testified, in his deposition in this case, that he knew on or about March 26, 2002 that a canine examination had been negative for the presence of flammable liquids (Ex. 23, Rogers Dep. at 61), Johnson has pointed to nothing from which the court can conclude that Rogers knowingly kept Laude in the dark or even was sufficiently involved in Johnson's trial that the court could impute to him knowledge of the trial evidence. It may be in the record, but it has not been brought to the court's attention.

Further, even if Dossey and/or Rogers obtained copies of the Gamboa Report, there is no evidence suggesting that they deliberately withheld the report from Laude. "If all the plaintiff can prove at trial is that these officers failed to take the initiative in providing the prosecutors with information," and that they did not "deliberately with[hold] information, seeking to misdirect or mislead the prosecutors and the defense,

then there is no genuine constitutional problem." *Newsome*, 260 F.3d at 825. Johnson

has not produced evidence to support the claim she must prove at trial to hold Dossey or

Rogers liable on a claim of conspiracy to suppress exculpatory evidence: that they did

anything to withhold, or acted knowingly in withholding, that information from Laude.

Summary judgment must be granted in their favor.

Summary judgment must also be granted on the *Brady* claim for the private

defendants. "[P]rivate defendants can be subject to a § 1983 action only if they conspired

with the state actors to violate Johnson's civil rights." *Johnson*, 515 F.3d at 782. To

show the existence of a genuine issue of disputed fact on this point, Johnson must show

that "(1) a state official and private individual(s) reached an understanding to deprive

plaintiff of [her] constitutional rights; and (2) those individual(s) were willful participants

in joint activity with the State or its agents." *Logan v. Williams*, 644 F.3d 577, 583 (7th

Cir. 2011). "[A] conspiracy certainly may be established by circumstantial evidence,"

but "such evidence cannot be speculative." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir.

2003).

Johnson points to the April 5, 2002 meeting and argues that the defendants

reached a conspiratorial agreement at that meeting. She cites evidence that Dossey made

phone calls to Allstate's McMahon before and after Johnson's arrest and that McMahon

met with Dossey, Rogers, and a representative of the DuPage County State's Attorney's

office in mid-July. Johnson notes that Allstate paid for Rayburn's trial testimony at

Johnson's first trial. Finally, Johnson argues that the fact that Rayburn received an

engineering report concerning the fire in August 2002 and completed his own report only

in December 2002, both occurring after McMahon had already denied Johnson's claim, is

suspicious. The court grants that Allstate's payment of its fire investigator, Rayburn, for the time he spent testifying at Johnson's criminal trial was improper; nevertheless, McMahon himself recognized that he should not do so at the time of Johnson's second trial, and his explanation, that Rayburn was Allstate's investigator so he was paid for his time, is not so suspicious that it can carry the weight Johnson seeks to ascribe to it. With other circumstantial evidence of wrongdoing, it might be significant. On its own, it appears to be an honest mistake. It certainly does not suggest a meeting of the minds to suppress exculpatory evidence.

With respect to the evidence of phone calls and meetings involving law enforcement personnel and personnel associated with Allstate's investigation, Dossey contacted McMahon on August 12, 2002 to inform him that Johnson would be arrested and on August 16, 2002 to confirm that Johnson had been arrested. In addition, Dossey contacted McMahon to follow-up on the Form II requests. McMahon admits that he made phone calls to Dossey. Clearly, information was shared between members of law enforcement and persons associated with Allstate. But Johnson fails to provide any evidence that these calls and communications were anything other than routine law enforcement communications; communication between police investigating an arson case and an insurance company investigating the same case seems to be not only routine, but authorized and encouraged by state law. Phone calls between investigators do not indicate a conspiracy when they are "nothing more than evidence that the officers remained in contact as they investigated the crimes." *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006); *see also Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002) (explaining that numerous phone calls between alleged conspirators,

"standing alone, merely proves that [the alleged conspirators] remained in contact," and "[t]o assert that the calls are evidence of a conspiracy is simply speculation"). Without more evidence, "to conclude that such phone calls establish a conspiracy is the purest of conjecture." *Alexander*, 433 F.3d at 557.

Nor is there a basis for believing that the mid-July meeting between McMahon, Dossey, Rogers, and a representative of the DuPage County State's Attorneys Office involved an agreement or any joint action to suppress *Brady* material. Dossey testified that law enforcement received a copy of various reports at this meeting. There is nothing suggesting that this meeting was anything other than a meeting to facilitate Allstate's compliance with the Form II requests.

Finally, Johnson argues that the late filings of both Leane's engineering report with Allstate in August 2002 and Rayburn's written report in December 2002 suggest a conspiracy because they were filed after Allstate had already denied Johnson's claim. Rayburn had to complete his written report so that McMahon could comply with the Form II request, which he was required to do by law; Leane was merely memorializing his findings in August and providing his formal report after he had already completed his investigation. Nothing is suspect about this conduct.

These problems with Johnson's conspiracy theory as to the private defendants–the absence of any evidence that they conspired with the state defendants–must be considered in conjunction with Johnson's inability to show that the state defendants concealed exculpatory information from Laude. Not only is there no evidence that the private defendants conspired with the police defendants, but there is no evidence that the

private defendants conspired with anyone to withhold material exculpatory evidence from the prosecutor.

Johnson's burden as to the private, corporate defendants is even greater than merely showing that they conspired with state law actors. As to Dropka & Rayburn and Allstate, there is no vicarious liability. "[A] private corporation can be liable [under § 1983] if the injury alleged is the result of a policy or practice, or liability can be 'demonstrated indirectly by showing a series of bad acts and inviting the court to infer from them that the policy-making level of [the corporation] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate officers.'" *Johnson*, 515 F.3d at 782 (quoting *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004)). If it could be shown that either Dropka & Rayburn or Allstate, as corporate defendants, were the "moving forces" behind misconduct that caused a *Brady* violation, these corporate defendants could be liable. *Id.* But here, Johnson cannot show that Rayburn and McMahon jointly acted with law enforcement to cause a violation of Johnson's *Brady* rights. If Rayburn and McMahon did not join any such conspiracy, the corporate defendants necessarily could not have been the "moving forces" behind any conduct that violated Section 1983. Thus, the Section 1983 claims against the corporate defendants also fail.

## IV. CONCLUSION

For the reasons stated above, summary judgment is granted on all Counts as to defendants Laude, Dossey, Rogers, Rayburn, Dropka & Rayburn Fire Investigation, Inc,

and Allstate Insurance Company. Johnson's motion for partial summary judgment against Laude is accordingly denied.

ENTER:

/s/ _____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 30, 2012